Rockingham, }
  Dec., 1896. }

### State v. Manchester & Lawrence Railroad.

A legislative enactment, whether contained in a special act of incorporation or in the general law, that whenever the net receipts from the use of a railroad shall exceed the average of ten per cent per annum on the expenditures of the corporation from the beginning of its operations the excess shall be paid into the treasury of the state, is not unconstitutional.

Debt. The declaration is as follows: "In a plea of debt for that the defendants are a corporation organized and existing under and by virtue of the laws of said state to construct and maintain a railroad from the city of Manchester, in our county of Hillsborough, to the state line in Salem, in said county of Rockingham, and it was and is provided in and by their charter, section 5, chapter 549, Laws of 1847, that in any and every year when the net receipts from the use of said road shall exceed the average of ten per cent per annum from the commencement of their operations, the excess shall be paid into the treasury of the state; that in 1849, the defendants constructed their said railroad from said Manchester to the state line, in said Salem, and have maintained their said railroad to the day of the purchase of this writ, and the plaintiff avers that the net receipts received by the defendants from the use of said road have in each and every year since the first day of January, 1867, exceeded an average of ten per cent per annum from the commencement of their operations by a large sum, to wit, the sum of seven hundred and fifty thousand dollars, which said sum the defendants, though hitherto requested, have neglected to pay into the treasury of said state: Whereby and by reason whereof an action has accrued to the plaintiff to have and recover of

the defendants said sum of seven hundred and fifty thousand dollars.

" Also, for that the defendants are a corporation duly chartered and organized under and by virtue of the laws of said state to construct and maintain a railroad within said state, and from the first day of January, 1849, to the date of this writ, have owned and maintained a railroad extending from the city of Manchester, in our county of Hillsborough, to the state line in Salem, in said county of Rockingham, and the plaintiff avers that the net receipts received by the defendants from the operation of their said railroad have exceeded the average of ten per cent per annum on its expenditures from the commencement of its operations in each and every year from said first day of January, 1849, to the date of the purchase of this writ by a large amount, to wit, by the sum of seven hundred and fifty thousand dollars, which said sum the defendants, though requested, have neglected to pay into the treasury of the state : Whereby and by reason whereof an action has accrued to the plaintiff to have and recover of the defendant said sum of seven hundred and fifty thousand dollars."

The defendants demurred.

*Edwin G. Eastman*, attorney-general, for the state.

*Oliver E. Branch* (with whom were *Worcester, Gafney & Snow*), for the defendants.

I. The state of New Hampshire brings this action, claiming the right to demand and receive of the Manchester & Lawrence Railroad the sum of $750,000 which it says was in the defendants' hands on the day of the purchase of the writ, and which was the accumulated net earnings of the railroad, over and above a certain percentage, from the commencement of its operations. Whether this sum of $750,000 is claimed to be the excess of the net receipts from the use of the road above the average of ten per cent per annum on its expenditures from the commencement of its operations, in each and every year, under the general law, as it existed at the time the charter was granted, or whether it is claimed to be the excess of the net receipts from the use of said road, above an average of ten per cent per annum, on an unknown and unspecified sum, but under the alleged provisions of its charter, it is not necessary now to inquire. The substance of the state's demand is, that it has a right, by force of some statute, to take from the defendants this sum of money, which, but for that statute, like the accumulated earnings of any individual or corporation, would belong to the stockholders. The defendants have demurred to

the first two counts in the declaration which set forth the grounds of the plaintiff's demand; and by this demurrer admit, for the purpose of the argument, that the net receipts of the defendants from the use of their road in each and every year since the first day of January, 1867, have exceeded an average of ten per cent per annum, by the sum of $750,000; or that the net receipts of the defendants from the operation of their road have exceeded an average of ten per cent per annum on its expenditures from the commencement of its operations, in each and every year from the first day of January, 1849, by the sum of $750,000.

II. The questions of law raised by the demurrer are constitutional questions. The defendants contend that whether the plaintiff's demand is founded upon the provisions of the general railroad law, or upon section 5 of the charter, in either case it cannot recover, because both statutes are unconstitutional. The three essential powers of the government are declared to be "legislative, executive, and judicial." Bill of Rights, *art.* 37. Through the intermediary of these powers and no others, the sovereignty of the state is expressed and enforced. Vatt. 12; Law. Wheat. 36; *Wooster* v. *Plymouth*, 62 N. H. 193, 197. Whatever powers, therefore, were granted under the title of a "Form of Government," and whatever powers under that title were vested in the legislature, are such as have reference to, and which the people deemed necessary for, the protection of their lives, their liberties, and their property; and no implication can arise that they were intended to authorize either of the three essential powers of the government to do anything, or to engage in any business undertaking or enterprise, not strictly limited to the necessities of such protection.

III. The state of New Hampshire, acting in its sovereign capacity, can obtain property *in invitum* in one of three ways only, all of which are limited to the necessities of the case or the occasion.

First. It may take it under the right of eminent domain. *Kohl* v. *United States*, 91 U. S. 367; *Opinion of the Justices*, 66 N. H. 629, 631; *Concord Railroad* v. *Greely*, 17 N. H. 47, 53; *Piscataqua Bridge* v. *Bridge*, 7 N. H. 35, 71; *Backus* v. *Lebanon*, 11 N. H. 19, 23.

Second. It may take it under the power of taxation, under constitutional limitations, which will be hereafter adverted to. But, in general, by taxation the government exacts money from individuals as their equal share of a justly imposed and apportioned public burden. *Hanson* v. *Vernon*, 27 Ia. 28; *Hammett* v. *Philadelphia*, 65 Pa. St. 146; *Opinion of the Justices*, 4 N. H. 565, 568; *State* v. *Express Co.*, 60 N. H. 219; *B., C. & M. Railroad* v. *State*, 60 N. H. 87, 94.

Third. It may obtain it by the exercise of the police power in

imposing fines and forfeitures as punishments. But here again the right is limited by the constitutional requirement of necessity. Bill of Rights, *art.* 18; *Opinion of the Justices,* 66 N. H. 629, 632. It may destroy property in the exercise of its police powers, in order to prevent fire, pestilence, crime, or other public disaster. But it can acquire property of the citizen or subject, against his will, only in the three methods and under the constitutional limitations specified. The whole idea of the state attempting to enrich itself in any way or to acquire property beyond the necessities of government, to embark in any enterprise, commercial, industrial, or speculative, for profit or gain, or for the advantage of any class or individual, is beyond the powers granted by the people in the constitution, and utterly foreign to the purposes for which that government was established. *Sharpless* v. *Philadelphia,* 21 Pa. St. 147, 169; *State* v. *Express Co., supra,* 252.

The right of the state to take $750,000 of the money of the stockholders of the Manchester & Lawrence road cannot be justified under the power of eminent domain, nor as an exercise of the police power. Unless it can be justified upon other grounds, it must fall within the taxing powers of the state; and if it be a tax not authorized in the constitutional sense, the enforcement of it is confiscation. *Opinion of the Justices,* 66 N. H. 629, 641; *State* v. *Express Co., supra,* 262; *Henderson* v. *Mayor,* 92 U. S. 259, 268, 269; *Railroad* v. *Husen,* 95 U. S. 465, 472; *Commonwealth* v. *Company,* 12 Allen 298.

IV. The statutes in question are an exercise of the taxing powers of the state. What then is a tax? "Taxes are burdens or charges imposed by law upon persons or property for public purposes, or to accomplish some governmental end." *Hanson* v. *Vernon,* 27 Ia. 28; *Allen* v. *J.,* 60 Me. 124; *Van Horn* v. *People,* 46 Mich. 183; *Broadhead* v. *Milwaukee,* 19 Wis. 624; *Association* v. *Topeka,* 20 Wall. 655; *Peirce* v. *Boston,* 3 Met. 520; *Hilbish* v. *Catherman,* 64 Pa. St. 154; *Roosevelt Hospital* v. *New York,* 84 N. Y. 108; *Association* v. *Wood,* 39 Pa. St. 73; *Northern Liberties* v. *Church,* 13 Pa. St. 104. "Taxation is an equal division of public expense." *State* v. *Express Co., supra.*

Distinctions are made between taxing powers and others analogous in appearance and effect. The term taxation is deemed to embrace the raising of revenue for the general expenses and purposes of the government. *Jones* v. *Commissioners,* 34 Mich. 273; *People* v. *Whyler,* 41 Cal. 351; *Hale* v. *Kenosha,* 29 Wis. 599. A license differs from a tax in that it consists of a right granted by competent authority to do an act which without such authority would be illegal, as distingished from a mere rate or sum of money assessed upon the person, property, or business of the citizen. *Cool.* Tax. 408; *Chilvers* v. *People,* 11 Mich. 43;

*Ash* v. *People*, 11 Mich. 347; *Mays* v. *Cincinnati*, 1 Ohio St. 268; *Youngblood* v. *Sexton*, 32 Mich. 406. A license may be distinguished from a tax, generally, in that a license is imposed as an exercise of the police power for the purpose of regulation and protection, and not for the purpose of revenue. Always and whenever the principal object of the law is revenue, under whatever form it may appear, it is an exercise of the taxing power.

So the power to tax is to be distinguished from the police power. Speaking generally, it may be said that the demand for money under the police power is secondary to the police regulation out of which the demand grows; while in the case of taxation the principal object is revenue. Cool. Tax. 396; *Moore* v. *State*, 48 Miss. 147; *Van Horn* v. *People*, 46 Mich. 183; *License Tax Cases*, 5 Wall. 462; *Ward* v. *Maryland*, 12 Wall. 418. Every burden imposed for revenue is levied under the taxing power, irrespective of the name by which the imposition is designated. *St. Louis* v. *Green*, 7 Mo. App. 468.

V. It is immaterial whether the plaintiff's claim is based upon section 5 of the defendants' charter, or upon the general law applicable to railroads, for in either case it is apparent that the object sought is revenue. The demand is that the defendants shall pay over to the state annually all their net earnings in excess of an amount equal to ten per cent upon either their expenditures from the commencement of their operations, or some other ascertained sum. This demand cannot be justified upon the theory of protection to the state by preventing the carrying on of a business which, if unregulated, would be injurious to the public, nor upon the theory that the defendants' business is of such a character as demands regulation by the requirement of a nominal sum as a license fee. It is the claim of a right on the part of the state to exact arbitrarily, and under no limitations of any principles of uniformity, equality, or regularity, whatever the defendants may earn in any year from the use of their own property above a certain sum. The amount demanded, the language of the law in which the demand is made, and the character of the subject upon which the demand is made, are such that there can be no reasonable doubt that the object sought is revenue.

The purpose of the law "must be determined by its natural and reasonable effect." *State* v. *Express Co.*, *supra*, 262. If the language of the general law had been that railroad companies should pay a tax into the state treasury annually of ninety per cent of their earnings above ten per cent upon their capital stock, or if section 5 of the defendants' charter had so provided, it would not be questioned that the imposition was a tax. It is a tax just the same, when the statute undertakes to

take from the defendants one hundred per cent, instead of ninety, or any other less percentage. A taxing statute which confiscates the whole of a man's property is an exercise of the same power which takes from him only a fraction of his property. As the proposition of the state to take from the defendants annually a large sum of money cannot be justified under the right of eminent domain, nor as an exercise of the police power imposing a fine or forfeiture, or for protection and regulation, nor as an assessment upon the defendants for an improvement to their property for which they obtain a direct benefit, it is apparent that it is a proposition to take from the defendant its property under the exercise of the general taxing powers of the state.

VI. No constitutional principle is more firmly established in New Hampshire than the principle of equality. If the constitution of New Hampshire could be compressed into one word, that word would be equality. Equality of rights before the law, equality of protection under the law, equality in the use and enjoyment of property, equality of privilege, immunity, and opportunity are guaranteed to every citizen, natural or artificial, within the state of New Hampshire. The finest achievements of the late Chief Justice *Doe*, in his long and distinguished career, are contained in those decisions in which he asserted and applied the fundamental principles of constitutional equality. The lasting service which he rendered to the state and nation in his efforts to liberalize and rationalize practice and procedure, and which will give a fadeless luster to his name and fame, was surpassed by that by which he established forever in the body of New Hampshire's jurisprudence the doctrine of equality. The strength and cogency of his reasoning, the clarity and conclusiveness of his deductions, the purity and grace of the language in which they were clothed, are not surpassed in legal literature. But in no class of cases has the principle of equality been more strenuously asserted, or more courageously applied, than in cases in which the taxing power is involved. *B., C. & M. Railroad* v. *State*, 60 N. H. 87; *State* v. *Express Co.*, 60 N. H. 219; *Railroad* v. *Elliot*, 58 N. H. 451; *Curry* v. *Spencer*, 61 N. H. 624; *Opinion of the Justices*, 4 N. H. 565.

Regarded as a tax upon the defendants, the requirement of the statute that they pay the state annually a sum of money in addition to the tax which they pay upon the assessed valuation of their property, violates the fundamental principle of equality and uniformity. The property of a corporation is held by it as inviolably as the property of a natural person. A corporation has the same right to acquire property, to earn money, and to distribute it to stockholders, or hold it for their benefit, as a natural person. *Dartmouth College* v. *Woodward*, 1 N. H. 111.

The surplus net earnings of the defendants above ten per cent upon the capital stock is the property of the stockholders. Their organization into a corporate body does not enlarge or modify the constitutional limitations upon the taxing power of the state. It does not introduce an extra-constitutional principle of inequality. If all corporations in the state were compelled to pay the balance of their net earnings left after the payment of a ten per cent dividend into the state treasury, there would be a discrimination against them and in favor of individuals having incomes or earnings, which would be in violation of the constitutional principle of equality. If all persons, natural and corporate, were compelled to pay into the treasury of the state the surplus of their income or earnings above ten per cent upon their capital or their investment, it would constitute an unequal division of public expense. The amount paid by one person or corporation, even though the amount of property or investment was the same as others, would be inevitably unequal, since the skill, enterprise, and the numberless details that enter into business success, and which determine the amount of profit and loss, are inevitably unequal; yet the protection, which is the price of taxation, would be the same.

VII. But the statute violates the principle of uniformity as well as of equality. If the tax is imposed by virtue of section 5 of the defendants' charter, it is a discrimination against that corporation only. If it is imposed under the provisions of the general law, it operates against corporations engaged in railroad transportation only. The tax is imposed upon an arbitrary classification or selection of persons engaged in a particular kind of business; not upon their property invested in the business, but upon the business itself. It is as indefensible a tax as it would be to compel all hotel keepers to pay the excess of their income above a certain percentage into the state treasury, or manufacturing corporations to pay their excess in like manner. The principle of uniformity of taxation cannot be evaded by any artifice of statutory classification or selection. The tax cannot be justified or sustained upon the doctrine that the defendants are taxed in the same manner as other railroad corporations, that is, that the tax is levied upon all corporations engaged in railroad transportation. If one corporation is to be taxed in this manner, all corporations must be; and one cannot escape and another be made to suffer because the business of the two differs. The statute permitting the incorporators of the Manchester & Lawrence road to engage in the business of common carriers, considered as a grant, simply removed the common-law prohibition against individuals acting in a corporate capacity as common carriers. 2 Mor. Corp., ss. 649, 658.

The true meaning and effect of any corporate grant is that it

creates an artificial, legal entity or personality which did not exist before and only exists as a legal fiction, but which in the concrete is represented by those who associate under its name. There is no logical or practical obstacle in the way of individuals doing the same work or engaging in the same identical business before they are incorporated as after. A company of individuals not acting in a corporate capacity could carry on the business of a railroad, or a single individual could do the same; but when those individuals become associated as a corporation, there has been brought into legal existence a personality which repre-sents the associated individuals, and holds, by another fiction of the law, and in trust for them, their indivisible property. An act of incorporation, properly regarded, confers no more rights or privileges upon the individuals composing it than they possess at common law, except in so far as they are given a legal right to act in what is known as a " corporate capacity." The kind of business in which they engage is not a creation of the statute, but the statute simply enables them to do the business in a corporate capacity. Therefore, an act of incorporation when considered as a legislative removal of a common-law prohibition has no resemblance or analogy to a contract as such; and the validity of statutes which affect the corporate existence merely, and not the property rights of the corporation, do not on principle fall within the statutory prohibition impairing the obligation of contracts. *Railroad* v. *Elliot,* 58 N. H. 451, 455; *Opinion of the Justices,* 66 N. H. 629, 640.

All private corporations are, generically, the same class of persons. The business in which they engage does not change their legal and constitutional rights any more than the business of a natural person changes his legal or constitutional rights. If, then, the legislature undertakes to levy a tax upon one corporation it must upon all corporations, under a constitutional, uniform, and equal valuation of their estates. And if it levies a tax upon corporations in this manner, it must levy a similar tax upon the property of individuals; otherwise the tax discriminates against corporations, and is, therefore, unconstitutional.

VIII. The provisions of the defendants' charter or of the general law, being in effect a tax, are unconstitutional upon the further ground that they involve double taxation. From the beginning of the history of railroads in this state, ample provisions, legal and constitutional in their imposition and operation, have been in existence for taxing the property of railroads. In all cases the tax has been levied upon the value of the property, that value being ascertained sometimes by taking the capital stock actually expended as the basis (R. S., *c.* 39, *s.* 4; C. S., *c.* 41; G. S., *c.* 57, *ss.* 1, 2), and sometimes by an actual assessment on the value of the road, rolling stock, and equipment as

near as may be in proportion to the taxation of other property similarly situated. G. L., c. 62, s. 1; P. S., c. 64, s. 1. But whatever method of assessment was adopted, the tax was levied upon the actual property of the railroad. No other constitutional valuation could be adopted. Article VI of the constitution, in which is found the entire legislative power to impose any tax (*State* v. *Express Co.*, *supra*), restricts the taxing power to an assessment of " polls and estates in the manner that has heretofore been practiced." In some jurisdictions, what are termed " franchise taxes " are imposed upon corporations; but if a railroad franchise is a species of property, the value of which is not included in its " estate," and which exists as a valuable thing separate and apart from its road, rolling stock, and equipment, then no constitutional provision exists in New Hampshire for taxing it, because it was not such an " estate " as was known or recognized before the adoption of the constitution. But if it is something indissolubly connected with the road, rolling stock, and equipment, as a going concern,— that is, its " estate,"— then it is taxed and has always been taxed in New Hampshire under the provisions providing for the taxing of railroads.

IX. But it is claimed by the state that the defendants are liable on contract. It is said: " The defendants' charter is a contract entered into with the state, and the defendants by building and maintaining their road have accepted it and agreed to be bound by its provisions." *Dartmouth College* v. *Woodward*, 4 Wheat. 518. If by this the state assumes that the defendants' charter is a contract, as the term contract is ordinarily used in the law, and out of which spring the mutual rights, obligations, and remedies which inhere in a contract at common law, I answer that such is not the law in this state. " By New Hampshire law, a special act of incorporation, authorizing the formation of a railroad company and the construction and operation of a railroad, like a general act authorizing the formation of corporations and general and limited partnerships, is a repealable and amendable statute and not a contract; and by New Hampshire law a reservation of the power of amendment and repeal is not necessary to enable the state to repeal the act, or to amend it to any extent within the bounds of legislation. Such a reservation (made necessary by the construction put upon the contract clause of the federal constitution by the federal court) is a retention of legislative power, and not a creation of a power of total or partial confiscation." *Opinion of the Justices*, 66 N. H. 629. This view of a railroad charter is contrary to the decisions which have been made since the decision in the Dartmouth College case; but it is the view taken by this court, and is the law in this state. I venture to say that it will become the law in

every jurisdiction when the real nature of a charter is more clearly understood, and the reasoning of the court in the Dartmouth College case more critically applied. 2 Mor. Corp., *s.* 1045.

It is not difficult to discover genuine contract relations existing among stockholders in a corporation, or between a charitable corporation or its trustees and donors and donees; and the position of the supreme court in the Dartmouth College case, that a charter is a contract, seems to have sprung out of the necessity which they felt they were under to protect the rights of the donors of gifts to Dartmouth College, held in trust by the trustees for the beneficiaries. But I submit that outside the contract relations which are clearly seen to exist among stockholders themselves, or between stockholders and the corporation itself or its trustees, and which it may fairly be said the state promises not to impair, there cannot be found in a railroad charter, nor was there shown to be by the supreme court in the Dartmouth College case, any of the essential elements of a contract.

The idea that a charter is a contract between the state and the grantees having been adopted without qualification after the decision in the Dartmouth College case, led, as is well known, to the practice in legislation of reserving by general law, or in separate charters, the right of amendment or repeal. *Greenwood* v. *Freight Company*, 105 U. S. 13, 19, 21. But it has been shown by this court (*Railroad* v. *Elliot*, 58 N. H. 451; *Opinion of the Justices*, 66 N. H. 629, 640) that " the reserved power of amendment and repeal is not anything more than the legislature would have had without a reservation, if statutes of incorporation had been held to be possessed of the ordinary amendable and repealable quality of other statutes. With the reservation of that power an act of incorporation, regarded as a grant, is an alterable and revokable grant, a gift or conveyance of something, a part or the whole of which the grantor can take back or destroy." The right of the state to enter into contracts is not questioned. The business of government involves the making of contracts for various purposes. But contracts which are outside the purposes of government, and which, in fact, embark the state in business enterprises, are beyond the purposes of government, *ultra vires*, and contrary to public policy.

But in this case, assuming the charter to be a contract in which, for some unnamed consideration, it is claimed that the defendants agreed to pay the state a part of their earnings, the contract is unconstitutional and void, because the legislature had no power to impose it as a condition upon the defendants' right to do a railroad business that they should be subjected to an unequal, unconstitutional burden of taxation. Such a provision inserted in the defendants' charter or in the general law is not legislation. *Opinion of the Justices*, 66 N. H. 629, 632, 634.

CARPENTER, C. J.　The policy of the state to limit the profits of persons and corporations to whom it grants the franchise of constructing public highways, and of taking tolls for the use of them as compensation for their services and disbursements, is older than the constitution and has been uniformly maintained. It has been effectuated in various ways.

The act entitled " An act to regulate ferries," passed February 28, 1783 (Laws, *ed.* 1797, *p.* 341), and reciting in the preamble that " the demands of ferrymen within this state for carrying the subjects thereof and others across the rivers in the same state are exorbitant and arbitrary," required the courts of general sessions of the peace in each county to establish the rates of ferriage for every ferry in the county, and prohibited ferrymen from charging or taking any greater tolls than those prescribed by the court.　In many of the subsequent grants of ferries an equivalent provision, though superfluous, was inserted.　Priv. Laws * 1798, *vol.* 11, *p.* 268; 1799, *vol.* 12, *pp.* 12, 16, 104, 150; 1800, *vol.* 13, *pp.* 118, 247; 1801, *vol.* 13, *p.* 247; 1804, *vol.* 15, *p.* 174; 1805, *vol.* 16, *p.* 116; 1817, *vol.* 21, *p.* 8.　The act, with amendments not here material, has ever since been in force. Laws, *ed.* 1830, *p.* 181; R. S., *c.* 64, *s.* 2; G. S., *c.* 72, *s.* 2; P. S., *c.* 80, *s.* 2.

Toll-bridge charters have contained a similar provision or have specified the rates of toll that may be taken.　Priv. Laws 1783, *vol.* 4, *p.* 495; 1792, *vol.* 6, *p.* 533; 1794, *vol.* 8, *p.* 256; 1795, *vol.* 9, *pp.* 77, 86, 246; 1802, *vol.* 12, *p.* 231; 1805, *vol.* 16, *p.* 227; 1836, *c.* 69; Laws 1878, *c.* 150.　Many charters provided that the bridge should become public property free of toll whenever the proprietors were reimbursed by tolls or otherwise for the expenses of erecting and maintaining the bridge, with interest at a specified rate.　Priv. Laws 1839, *cc.* 30, 32; Laws 1848, *c.* 795.　In some cases the justices of the court were required to so regulate the tolls that the proprietors should receive not more than a named annual percentage of profit upon their investment.　Laws 1816, *c.* 71; 1817, *cc.* 11, 28; 1818, *c.* 75; Priv. Laws 1835, *c.* 6; 1836, *cc.* 69, 105; 1838, *c.* 19.　In 1877, the legislature — after reciting that the charter of the Portsmouth Bridge granted in 1819 (Laws 1819, *c.* 50) required the proprietors to exhibit to the justices of the court an account of the sums expended on the bridge and the justices thereupon to fix the tolls, and that the proprietors had negligently omitted to exhibit such account and had themselves without legal authority established excessive and unreasonable rates of toll — resolved " that the justices of the supreme court are hereby instructed to

---

* Private acts prior to 1835 have, with some exceptions, never been printed.　The references to private laws enacted before 1835 are to the volumes of manuscript laws in the custody of the secretary of state.

revise the rates of toll now collected by said proprietors of Portsmouth Bridge, and to establish the same at reasonable rates." Laws 1877, *c.* 180.

Similar provisions are found in canal charters. Priv. Laws 1792, *vol.* 6, *p.* 541; 1792, *vol.* 8, *p.* 92; 1804, *vol.* 15, *p.* 41; 1816, *vol.* 20, *p.* 419; 1824, *vol.* 22, *pp.* 448, 505, 513, 524; 1827, *vol.* 24, *pp.* 325, 339; 1833, *vol.* 30, *p.* 86. The last charter, granted in 1836, prescribed the tolls that might be taken and provided that the "rate of toll may be increased or diminished by the court of common pleas, on application to them, as in their opinion justice may require." Priv. Laws 1836, *c.* 102.

The first turnpike charter was granted June 16, 1796. Laws, *ed.* 1797, *p.* 325. It specified the rates of toll and provided "that at the end of every twenty years an account of the expenditures upon said road and the profits arising therefrom shall be laid before the judges of the superior court for the time being; . . . and if the net profits for the said twenty years shall exceed twelve per cent per annum, the said court may reduce the future toll so far as that it may not exceed twelve per cent, and if the profits shall not amount to six per cent the said court may raise the toll, so that it shall not be less than six nor exceed twelve per cent." All the numerous subsequent charters of turnpikes, intended and necessary for the common and ordinary use of the general public, have contained a like provision with various modifications of time, rate per cent, and of the method of fixing the tolls, so that the authorized profits should not be exceeded. A few only are cited. Priv. Laws 1799, *vol.* 12, *p.* 185; 1802, *vol.* 13, *pp.* 79, 326; 1804, *vol.* 15, *pp.* 57, 76, 112, 320; 1805, *vol.* 16, *pp.* 99, 118, 127, 279; 1807, *vol.* 17, *p.* 145; 1809, *vol.* 18, *p.* 243; 1812, *vol.* 19, *pp.* 154, 181; 1820, *vol.* 21, *p.* 537; 1828, *vol.* 26, *p.* 135; 1834, *vol.* 30, *p.* 297; 1837, *c.* 3; Laws 1852, *c.* 1360.

The first railroad charter, enacted January 1, 1833 (Priv. Laws 1832, *vol.* 29, *p.* 215), created the Boston & Ontario Railroad corporation, granted tolls to be fixed by the directors, and provided that "if at the expiration of ten years from and after the completion of said road, the net income or receipts from tolls and other profits, taking the ten years aforesaid as the basis of calculation, shall have amounted to more than ten per cent per annum upon the cost of the road, then the legislature may take measures to alter and reduce the rate of tolls and other profits in such manner as to take off the surplus for the next ten years, . . . and at the expiration of every ten years the same proceedings may be had"; and "that the legislature shall not at any time so reduce said tolls and other profits as to produce less than ten per cent per annum upon the cost of said road without the consent of the corporation." Under this charter no effective

action was taken. The Concord Railroad was next incorporated, June 27, 1835. Priv. Laws 1835, c. 1. The charter granted a toll to be fixed by the directors and provided that " if at the expiration of five years from and after the opening of said road for use, the net income or receipts from tolls and other profits shall have amounted to more than ten per cent per annum upon the whole cost of the road from the time of the disbursements, the legislature of this state may take measures to alter and reduce the rate of tolls and other profits in such manner as to take off the overplus for the next five years, calculating the amount of transportation upon the road to be the same as the five preceding years; and at the expiration of every five years the same proceedings may be had." The same provision in nearly identical terms is found in the other twelve railroad charters granted before December 25, 1844, except that in four of them the net profits were limited to eight per cent. Priv. Laws 1835, cc. 7, 14, 37; 1836, c. 66; 1837, c. 1; 1839, cc. 18, 20; 1842, c. 3; 1844, cc. 111, 112, 113, 188.

The obvious purpose of the legislature in limiting and providing for the regulation of the tolls granted was to restrict the profits of the grantees within limits deemed reasonable, and thereby to secure to the public the enjoyment of the property devoted to public use at reasonable rates. In the railroad charters, as well as in many others, the authorized net profits were made the standard of reasonable tolls.

The eleventh section of " the general railroad law " (*Concord Railroad* v. *Greely*, 23 N. H. 237, 242), approved December 25, 1844 (Laws 1844, c. 128), provided that " such corporations shall keep exact accounts of all their receipts and expenditures and make annual reports thereof to the railroad commissioners, who shall annually communicate the same to the legislature, and in any and every year when their net receipts shall be found to exceed the average of ten per cent on their expenditures from the commencement of their operations, the excess shall be paid into the treasury of the state until otherwise directed by the legislature." This enactment has ever since remained in force. G. S., c. 144, s. 5; P. S., c. 157, s. 19. To it every railroad charter thereafter granted has been subject. Its operation is uniform. It applies to all railroads in the state. For many years after its adoption (as in the case of ferries), an equivalent but superfluous provision was inserted in railroad charters. Laws 1844, c. 189, s. 4; *Ib.*, c. 190, s. 4; *Ib.*, c. 191, s. 4; Laws 1845, c. 286, s. 4; *Ib.*, c. 287, s. 4; Laws 1847, c. 549, s. 5; *Ib.*, c. 550, s. 4; Laws 1849, c. 906, s. 4; *Ib.*, c. 907, s. 4; *Ib.*, c. 908, s. 4; Laws 1854, c. 1596, s. 4; Laws 1859, c. 2297, s. 4; Laws 1863, c. 2792, s. 4; Laws 1866, c. 4318, s. 4; Laws 1867, c. 85, s. 4; Laws 1868, c. 100, s. 4; Laws 1869, c. 70, s. 4; Laws 1870, c. 58,

*s.* 4; *Ib., c.* 59, *s.* 5; *Ib., c.* 60, *s.* 4; Laws 1871, *c.* 71, *s.* 4; *Ib., c.* 72, *s.* 4.

The general statute was not a change of policy, but of method. Its purpose was not to obtain revenue, but to enforce the established policy of the state. The profits of the proprietors of railroads were limited to ten per cent for the sole purpose of securing to the public reasonable rates of toll. The reason for the change of method is obvious. Railroads were in their infancy. It was impossible to estimate with reasonable accuracy the cost of building or the expense of maintaining and operating them. The rates of toll requisite to give the grantees of the franchise their authorized profits, and no more, could not, as in the case of bridges and turnpikes, be approximately estimated in advance, nor was it practicable for the legislature, the court, or for any official board, except the officers of the corporations, to make the frequent modifications of the tolls necessary to bring the net income up to and not exceeding the authorized limits. Ten per cent annual profits remained, as before, the standard of reasonable tolls. Any inducement to maintain or to increase them so as to reap greater profits was effectually taken away. If they were established so as to yield a greater income than ten per cent, the legislature deemed it reasonable that the excess should as nearly as practicable be returned to those who suffered from the exaction,—that is to say, to the taxpayers of the state. It was impossible to return to each individual the excess above a reasonable toll that he had been compelled to pay for transportation. Excessive tolls were injurious, not only to the immediate patrons of the road, but to every citizen who resided within the scope of its influence,— more or less, in fact, to every property owner in the state. Refunding to them the excess of tolls taken was the nearest approach to exact justice that was possible.

The defendants say in argument that the state can take the property of citizens against their will in one of three ways only, namely : (1) Under the power of eminent domain; (2) under that of taxation ; and (3) in the exercise of the police power, by imposing fines or forfeitures as punishment. Whether this proposition is or is not sound need not be considered. The state in this action is not seeking to take the defendants' property against their will, except as every action to enforce a legal obligation is a proceeding against the defendant's will. It seeks to recover its own property. Unless it shows that the defendants have in their hands $750,000, or some part of that sum, legally belonging to the state, its action must fail. The action is, in effect, for money received by the defendants for the use of the state. A judgment in favor of the state and its enforced satisfaction will be no more a taking of the defendants'

property against their will than would be a levy by the state of an execution upon the lands of a recognizor against whom it had obtained judgment. The state in this action stands precisely as an individual in a like action. It is subject to the same rules of law and evidence. It has no greater power, rights, or privileges than any plaintiff. It must establish the defendants' legal indebtedness, or it must fail.

The fifth section of the defendants' charter provides " that in any and every year when the net receipts from the use of said road shall exceed the average of ten per cent per annum from the commencement of their operations, the excess shall be paid into the treasury of the state until otherwise ordered by the legislature." Priv. Laws 1847, c. 549. This clause of the defendants' charter is identical with the general railroad law of 1844 (Laws 1844, c. 128, s. 11), and was superfluous. *Opinion of the Justices*, 66 N. H. 629, 671–673. The general law and the charter imposed on the defendants no duty which they did not directly and voluntarily assume. They presented to the defendants a proposition which they were at liberty to accept or to reject. The defendants accepted the charter subject to the burdens by it imposed. The provision that they should pay to the state the excess above ten per cent was a qualification of, or burden imposed upon, the franchise granted them, exactly like the various other duties required of them, as, for example, in case their road should cross any canal, turnpike, or other highway, to so construct it as not to " obstruct the safe and convenient use of such canal, turnpike, or other highway," and to maintain in good repair all bridges " they may construct for the purpose of conducting their railroad over any canal, turnpike, or other highway, or any private way, or for conducting such private way, turnpike, or other highway over said railroad." Charter, ss. 11, 13. The limitation of their income to ten per cent was no more a tax upon their property than were the various obligations imposed upon them. It and they alike were burdens upon the granted franchises, diminishing their value, and to be considered in assessing the value of the defendants' property for the purpose of taxation or under the law of eminent domain.

The objection that the provision of the charter, as well as the general law, violates the principle of uniformity and equality has no foundation in fact. All railroad corporations in the state, by virtue of express provisions of their charters or of the general law, are subject to the same obligation. The law applies uniformly and equally to all railroads. It is said, however, that it does not apply to other corporations and therefore is unequal. But this is not an unconstitutional discrimination. It might as well be claimed that laws regulating the business of dentists (P. S., c. 134) are unconstitutional because they do not apply to farmers.

In answer to the plaintiff's claim that the action is founded upon the defendant's contract, they say that by the law of this state, whatever may be the federal law, a charter is not a contract,— that is to say, not a contract within the meaning of the clause in the federal constitution which forbids the enactment by the states of any law impairing the obligation of contracts. Whether this proposition is sound or unsound need not be considered. It is not here material whether the legislature, in the absence of a reserved right and without the grantees' consent, can or cannot repeal or alter a charter which they have granted. The question is not whether the defendants' charter may be repealed or modified, but whether as long as it subsists they are bound by its provisions. No case has been cited or found in which it has been held or suggested that the grantees of a franchise are not obligated to do and perform all things expressed in the grant to be by them performed as long as they enjoy the benefit of the grant. The obligation to the public imposed on the grantees of the right to take tolls is always a part, and not infrequently the whole, of the consideration of the grant. By the common law, one who accepts a grant from the sovereign containing a provision that he shall perform acts therein specified to be performed by him covenants that he will perform them; and for their non-performance an action of covenant lies, where that form of action is an appropriate remedy. *Ewre* v. *Strickland,* Cro. Jac. 240; *Bret* v. *Cumberland,* Cro. Jac. 399, 521; *Lyme Regis* v. *Henley,* 3 B. & A. 32; *Lyme Regis* v. *Henley,* 2 C. & F. 331, 349, 350.

There is nothing in the *Opinion of the Justices,* 66 N. H. 629, that supports any position taken by the defendants. There the state claimed that, regardless of the seventeenth section of the charter of the Concord Railroad, it could take the road upon paying its owners less than its value upon the grounds (1) that the constitution does not require compensation to be made for private property taken for public use, and that the state is not bound by contract or otherwise to refrain from partial confiscation; and (2) that, by the terms of the charter, "the legislature may at any time hereafter alter, amend, or modify this act or any of its provisions," and therefore that, short of total confiscation, there was no limit to the power of amendment. It was the opinion of the justices that neither of these positions could be sustained for the obvious reasons (1) that the property of a partnership called a corporation is as fully protected by the constitution as that of an individual; and (2) that authority to alter, amend, or repeal the charter of a corporation is not authority to confiscate the corporate property, or any part of it, either during the existence of the corporation or after its dissolution. The third and principal ground on which the state

claimed authority to take the road was founded upon the seventeenth section of the charter, by which it was expressly provided that the state might purchase the road at any time after twenty years from its completion, by paying to the corporation "the amount expended in making the road" and "such additional sum as, together with the tolls and profits of every kind which they shall have received from said railroad, will be equal to a net profit of ten per cent per annum on the cost of said road from the time of payment thereof by the stockholders to the time of purchase." This position of the state the justices did not sustain for the sole reason that, in their opinion, section 17 of the Concord Railroad's charter and section 11 of the general railroad act of 1844 to the same effect were repealed in 1867. By the repeal the state renounced or released its right of purchase. It was not claimed by the counsel for the road, nor intimated by the justices, that section 17 of the charter, or the general law, was unconstitutional and therefore void. It was conceded by the parties and assumed by the justices that the state was entitled to purchase the road at the price stated, unless the clauses in the charter and the general statute authorizing the purchase were repealed. Upon no question now presented was any opinion expressed.

All the rights, powers, and property vested in the state are held by it in trust for the people. *Lumber Co.* v. *Company*, 65 N. H. 290, 387. One of its powers is that of granting franchises. The franchise of taking tolls is property. Ever since the act of June 27, 1816 (Laws 1816, *c.* 33), it has been subject to attachment and levy like other property. R. S., *c.* 184, *s.* 13; P. S., *c.* 220, *ss.* 7, 15. A grant by the state of such a franchise differs in no respect that is here material from its grant of any other property — as, for example, the public lands — which it has the power to convey.

An individual may convey his property upon such terms and conditions consistent with law as he pleases. The power of the state cannot be less. It is sovereign except in so far as its powers are limited by the state and federal constitutions. No constitutional provision has been pointed out or discovered which denies to the state the power to convey whatever it has the right to convey — whether lands or franchises — upon such terms and conditions as to the legislature may seem fit. The grantee need not accept the grant unless he chooses to do so. It is for him to say whether the benefits conferred outweigh the burdens imposed. He may reject the gift; but if he accepts it, he must take it with all the qualifications and burdens that are thereto annexed.

The defendants by accepting their charter and acting under it bound themselves to do all things therein required of them,

For their non-performance of their various obligations the law provides appropriate remedies. 2 Mor. Corp., *ss.* 1132–1136. For the non-payment of moneys which they have bound themselves to pay to the state, debt or covenant is a proper remedy.

*Demurrer overruled.*

All concurred.