Rockingham, {
    Dec., 1900. }

STATE *v.* MANCHESTER & LAWRENCE RAILROAD.

Under section 11, chapter 128, Laws 1844, providing that when the net receipts of a railroad corporation shall exceed the average of ten per cent per annum on its expenditures from the commencement of operations the excess shall be paid into the treasury of the state, such percentage is to be computed upon the sum actually contributed by the stockholders, and not upon the entire amount expended in the construction of the road.

In an action to recover the excessive receipts of a railroad corporation, it is incumbent upon the state to establish the fact that dividends paid to stockholders in excess of the legal amount came from the earnings or net receipts for the use of the road ; and it cannot prevail when it appears that such sums were derived from sources other than tolls collected of the public.

DEBT, to recover the excess above the average of ten per cent per annum of the defendants' net receipts.    Trial by a referee, upon whose report judgment was ordered for the defendants, subject to exception.

*Edwin G. Eastman*, attorney-general, for the state.

*Oliver E. Branch*, for the defendants.    The defendants contend that the first question to be determined is : What are the provisions

of the defendants' charter? That the second question is: What is the basis upon which the ten per cent per annum is to be computed? Other questions will arise hereafter, but the foregoing are first to be disposed of.

Chapter 549, Laws 1847, is called the defendants' charter; but that chapter is not the whole of the defendants' charter. *Opinion of the Justices,* 66 N. H. 629, 671; *State* v. *Railroad,* 69 N. H. 35, 47; *Concord Railroad* v. *Greely,* 23 N. H. 237. "The eleventh section of 'the general railroad law' . . . (Laws 1844, *c.* 128) provided that 'such corporations shall keep exact accounts of all their receipts and expenditures, . . . and in any and every year when their net receipts shall be found to exceed the average of ten per cent on their expenditures from the commencement of their operations, the excess shall be paid into the treasury of the state until otherwise directed by the legislature.' This enactment has ever since remained in force. G. S., *c.* 144, *s.* 5; P. S., *c.* 157, *s.* 19. To it every railroad charter thereafter granted has been subject. Its operation is uniform. It applies to all railroads in the state. . . . The fifth section of the defendants' charter . . . is identical with the general railroad law of 1844, and was superfluous." *State* v. *Railroad, supra,* 47, 49.

It is apparent that section 5 of the defendants' charter is meaningless, since it does not specify upon what the excess of an average of ten per cent per annum from the commencement of its operations shall be computed. Nor is this defect cured because three other charters, passed at the same session, contained the same omission. An examination of these charters discloses the fact that they were all drafted by the same person, or copied from the same form. If, as claimed by the state, this uniformity in the omission of important words from all these charters (the effect of which was to render them extremely obscure, if not meaningless) "shows that the terms were advisedly employed, and were so well understood that no qualifying or explanatory words were deemed necessary," it seems strange that the legislature, having its attention drawn directly and specifically to the phraseology of those sections, should after all have left them in so dubious and uncertain a condition. But this discussion is almost irrelevant. Whether section 5 of the defendants' charter is defective and meaningless as it stands, or perfectly complete and clear, it has already been held by this court to be "superfluous." The defendants say that it is both defective and superfluous, and that for it section 11, chapter 128, Laws 1844, is to be substituted. So, too, section 10 of the same chapter, which provides for the purchase of the defendants' property by the state, was, until repealed in the revision of 1867 (*Opinion of the Justices, supra,* 673; *State* v. *Railroad, supra,* 51), a part

of the defendants' charter, rendering section 9 of that charter also "superfluous" and immaterial, except, in so far as being contemporaneous legislation, it throws some light upon other provisions of the defendants' charter and other provisions of the act of 1844. We therefore submit that in determining the question upon what the ten per cent per annum is to be computed, for the purpose of determining the excess, if any, which may be claimed by the state, all provisions of the general law of 1844 that are germane to the question, as well as the special provisions of the defendants' charter, must be considered. Section 5 of the defendants' charter being meaningless as well as "superfluous," the state's right of action must therefore stand upon section 11 of the general law of 1844. Here the language is plain, unambiguous, and not defective.

There can be no question that the basis of computation provided for in section 11 of the general law, is the defendants' "expenditures from the commencement of its operations." And it seems to us it is entirely evident that in drafting section 5 of the defendants' charter, and the other railroad charters passed at the same session of the legislature, the words "on their expenditures" were inadvertently omitted. But, as we have before remarked, this is immaterial. We therefore contend that in computing the excess above ten per cent, the expenditures of the defendants from the commencement of their operations are to be taken as the basis ; and that by the word "expenditures" the legislature did not and could not mean "capital stock," but meant and intended to mean the amount actually expended in building the road, or "the cost of such road." It will be observed that in section 10, which reserved to the state the right to purchase the road, the purchase price should be "all it may not have received of its expenditures," or, as otherwise stated in section 9 of the charter, "by paying them therefor the amount expended in making said road, and, in addition thereto, by paying said corporation such additional sum as, together with the tolls and profits of every kind which they shall have received of said railroad, will be equal to a net profit of ten per cent per annum on *the cost of said road from the time of the payment thereof by the stockholders to the time of purchase*." The italicized words cannot be distinguished in meaning from "its expenditures from the commencement of its operations."

Clearly the legislature intended that the excess of earnings should be computed upon the "expenditures" of the defendants from the commencement of their operations, and no other language could have been more aptly employed to cover what is more generally and recently designated "cost of construction." The expenditures of a railroad from the commencement of its operation would, ordinarily, be understood to mean the same thing as con-

struction; whereas, the "stock" of a railroad is not and cannot be used interchangeably and indifferently with "expenditures," or even with "construction." It is evident that the legislature had in mind two different things when speaking of "expenditures" and "stock." In section 13 of the act of 1844 it was provided that "the rates of toll, . . . when the net income of the stock shall exceed ten per cent, shall be subject to alteration and revision by the legislature according as they shall deem just and expedient." If the term "expenditures" as used in the act means "stock," as contended for by the attorney-general, why did not the legislature use one or the other of those expressions uniformly, instead of with an apparent distinction in different sections of the same act?. Why is the term "expenditure" used in sections 10 and 11 instead of the word "stock" if stock was intended? To us it seems perfectly plain; and that the reason was that it was the intention of the legislature to permit the proprietors of railroad corporations to retain out of their net earnings a sum equal to ten per cent upon the amount invested in property which was to be subject to a public use, but reserving the right in the state to any excess, so long as the tolls producing that excess should remain unchanged by the legislature.

We regret that the attorney-general has not explained what he means by the "practical results." But let us see what would be a practical result if his contention is correct. It is entirely within the range of possibility that the defendants' railroad might have been built without issuing a dollar's worth of stock. If so, then, according to the philosophy of the attorney-general, the entire net receipts would belong to the state, since there would be no "stock" upon which to estimate the excess above ten per cent. It is also entirely conceivable that the defendants' road might have been constructed at a cost of $1,000,000, when the stock representing that cost was not fully subscribed for or paid in, and would amount to no more than $500,000, so that the total cost of the road would be represented by the $500,000 of stock paid in and $500,000 indebtedness. Would it be reasonable or sensible to say under such circumstances that the state would be entitled to the excess of net earnings above ten per cent upon $500,000 in the year which showed this condition, whereas, in the next year perhaps, when the entire stock was subscribed for and paid in and the indebtedness wiped out, that the ten per cent could and should then be computed upon the entire stock which the year before was represented by $500,000 of stock paid in and $500,000 of borrowed money that had actually gone into the building of the road? If the legislature intended stock by the word "expenditure" nothing could have been easier than to say so. The omis-

sion to say so discloses an intent to discriminate, and to distinguish "expenditures" from something else. That the legislature meant the cost of the road is evidenced by the use of the term "cost" in section 9 of the defendants' charter. If the state had elected to take the defendants' road after the expiration of twenty years, and its stock at that time had been only $750,000, while its indebtedness was $250,000 more, would it be contended for a moment that the amount to be paid by the state should be only the amount of its stock, so that the stockholders would be compelled to pay the floating indebtedness of $250,000 out of their own pockets? We apprehend the attorney-general would not assert so absurd a proposition. But if the word "expenditures" in section 10 of the general law and the words "cost of its road" in section 9 of the defendants' charter mean, and were intended to mean, "the cost of the road," why, we beg to know, does not the word "expenditures" mean the same thing in section 11 of the general law?

We are not left in doubt upon this point. In *Opinion of the Justices, supra,* 648, Chief Justice *Doe,* in discussing the intent of the legislature in using the peculiar language which was employed in the early railroad charters (which were modeled after the old turnpike charters) and the reasons underlying the policy of the state in chartering railroads, said: "The expense of land damages, construction, and repairs being considered too heavy to be laid upon taxpayers at the date of the charter, the stockholders were induced to incur that expense by the promise of tolls. When, in the opinion of the legislature, the cost of buying the road and keeping it in repair would not be too heavy a charge to be borne by taxation after a certain time, the agreement was that the state might abolish the tolls by buying the road." This language is tantamount to a judicial construction of the meaning of the word "expenditures" as used both in sections 10 and 11 of the law of 1844, and omitted from section 5 of the defendants' charter. That is to say, the word "expenditures" is here construed to be the expense of "land damages and construction," which would be comprehensively included, whenever the state should exercise that right, in the expression "what the road had cost." In *State* v. *Railroad, supra,* 45, still further light is thrown upon the question under consideration, in the discussion of the same matter by Chief Justice *Carpenter.* In the opening sentence of the opinion he says: "The policy of the state to limit the profits of persons and corporations to whom it grants the franchise of constructing public highways, and of taking tolls for the use of them as compensation for their services and disbursements, is older than the constitution, and has been uniformly maintained."

In *Opinion of the Justices, supra,* 631, one of the questions there passed upon was whether, assuming that the state of New Hampshire could take the Concord Railroad, it could do so by paying less than it was worth; and the court in effect held that if the state exercised its right of compulsory purchase or of resumption " it could not do so by paying less than the property was worth." In other words, it established the proposition that the amount which the state would be required to pay for a railroad under the right reserved in its charter, or by the general law, would be the value of the road, or the amount which it had cost or was worth to the proprietors. That this is equivalent to the term " expenditures," as used in the general law and in the defendants' charter, needs no argument to demonstrate; and that by the word " expenditures " was not meant " stock," but the actual investment in the railroad as a going concern, including " land damages and construction," is abundantly sustained in the opinions from which the foregoing extracts have been made. Is it not most unreasonable to suppose that, whereas the state could take the defendants' road only upon paying what it cost, with interest thereon at the rate of ten per cent per annum, less whatever had been received as net profits, it could, before it exercised its reserved right of purchase, exact of the defendants certain sums annually, to wit, all net earnings above ten per cent computed upon the capital stock, and which it would be compelled to repay at the time of purchase? In other words, is it not most unreasonable to suppose that the legislature intended to make the investment of the corporation, or of its stockholders, less advantageous if they ran the road than it would be if the state bought it?

If the defendants are indebted to the state approximately $69,000, as claimed by the attorney-general, which sum represents the excess of net earnings above ten per cent computed upon the stock, and should pay a judgment of that amount, and in one year after the state should exercise its right of purchasing the defendants' road, paying its total cost with interest thereon at the rate of ten per cent per annum from the beginning of its operations, less ten per cent computed upon the capital stock, it would be required to pay back the identical $69,000 which it had received from the corporation. This is the logical result of the attorney-general's contention,— a result so palpably unreasonable as to demonstrate the complete fallacy of his premises.

Suppose the stock of the road during the period of construction had kept an even pace with the cost, then, unquestionably, upon the theory of the state, the corporation could retain out of the net earnings ten per cent upon the cost, because the cost would be the same as the stock. How is the situation altered, within the intent

of the legislature, because the stock could not be, or was not, subscribed for in sufficient amounts during that period to cover the cost of construction? It seems clear that it was contemplated by the legislature that the cost of construction might at any time exceed the authorized capitalization; and that it was their intent to establish a general rule, or a general policy (*Opinion of the Justices, supra,* 648), as to the profits which under any and all circumstances should be retained by the corporation (*State v. Railroad, supra,* 48); and that this general policy was to permit the corporation to have and retain ten per cent upon the corporate investment, whether the state exercised its right of purchase or its right to share in the profits; and that section 13 was not intended to be any modification of this general principle.

Can it reasonably be supposed that it was the intent of the legislature that rates of toll should be reduced in accordance with section 13 of the general law before the defendants' road was completed and fully paid for, or to reduce the rates of toll so that the net income of the road would be less than "ten per cent upon its expenditures from the commencement of its operations," or to reserve the right to reduce tolls before it could be known definitely what the stock would be upon which the net income of ten per cent was to be computed? Taking the whole act together, we think it is entirely clear that what was contemplated by the legislature in section 13 was that when the road was fully completed, and stock covering its cost was issued, then, when the income upon the stock, or, what would be the same thing, "the cost of the road," reached ten per cent, that the legislature might revise the rates of toll so as to keep the income of the road within the authorized limits. This view is sustained by the language of the court in *State v. Railroad, supra,* 48.

The defendants do not claim that the ten per cent is to be computed upon indebtedness as such, but upon so much of the cost of the road as it was indebted for; but not upon any indebtedness which was not represented in fact by actual expenditures for construction and equipment. Could it make the slightest difference to the state whether the whole or a part of the cost of the road represented borrowed money or money paid in on stock? Suppose the stockholders borrowed the money, as probably many of them did, at seven or eight or nine per cent to pay for their stock, nevertheless, they would be entitled to receive, according to the admissions of the attorney-general, ten per cent upon that identical stock; but would the state be any worse off than it would be if the stockholders had not borrowed the money to pay for their stock? The supposition of the attorney-general that the defendants, as they interpret their rights, might borrow $500,000 at four per

cent, and out of the net income pay interest upon the loan and make a profit, is unfounded. The defendants do insist that they have the right at any time, under their charter or the general law, to make permanent additions to the property, that they may do it now, or as they did in 1892, when they purchased additional land at Manchester for depot grounds and terminal facilities; and that this would be as legitimate a part of the cost of the road, or as legitimate a part of " expenditures from the commencement of its operations," upon which they are entitled to retain under their contract with the state ten per cent out of net earnings, as what they paid for the land at Manchester originally. Moreover, it is immaterial what rate of interest might be paid upon money borrowed for such purposes, since that would not change the fact that the money borrowed was used to pay for their property. If no stock had been subscribed for or taken from 1849 to 1856, when the road was completed at a cost of $1,000,000, and they had borrowed the entire sum at six per cent interest, they would nevertheless be entitled to have and to hold out of the net profits an average of ten per cent per annum from the beginning of operations computed upon their " expenditures," since the right to do so is embodied in their contract with the state.

The referee having found as a fact what the intention of the legislature was, that finding is not open to question or review here. So, also, the finding of fact by the referee that it was the intent and purpose of the legislature to permit the defendants to retain out of their net earnings in each and every year, and to distribute among stockholders, a sum which should yield an average annual income of ten per cent per annum upon the amount of their expenditures, and that in computing this annual income interest must be allowed upon the deficiency in every year in which there was a deficiency, is a finding of fact which is not here open for review. So, too, if the court finds that the items of interest upon borrowed money and the amounts paid as premiums for retiring preferred stock were not properly charged to the construction account, so that the construction account is in fact as found by the referee, his finding that the state is entitled to offset against the deficiency in net earnings and interest thereon claimed by the defendants the excess which has been paid annually since 1866, with interest thereon in each and every year, is not open for review.

PEASLEE, J. The state claims to recover from the defendants sums alleged to have been received by them in excess of the amount they are allowed to receive and retain, as against the public. It charges that the defendants have divided to their stockholders more than the ten per cent specified in the statutory grants

to them. The parties disagree as to what the amount is upon which the percentage is to be reckoned, and also as to whether the stockholders are entitled to interest upon deferred dividends.

The claim of the state is that the defendants can divide ten per cent upon the capital stock issued, and no more; while the defendants insist that they are entitled to that per cent upon all money expended in the construction of the road. It is not necessary to construe the provision of the charter upon this point (Laws 1847, c. 549, s. 5), because it is so nearly identical with the general law as to be superfluous. *State* v. *Railroad*, 69 N. H. 35, 49. The act which controls here is the law which was applicable to all railroads. *Opinion of the Justices*, 66 N. H. 629, 671. It reads as follows: " Such corporations shall keep exact accounts of all their receipts and expenditures, and make annual reports thereof to the railroad commissioners, who shall annually communicate the same to the legislature, and in any and every year when their net receipts shall be found to exceed the average of ten per cent on their expenditures, from the commencement of their operations, the excess shall be paid into the treasury of the state, until otherwise directed by the legislature." Laws 1844, c. 128, s. 11. The question is: What was intended by the use of the word " expenditures " ? Did the parties to the legislative grant understand that the meaning of this word included all that the corporation paid out in the construction of the road, irrespective of whether the funds so used were actually contributed by the owners of the enterprise, or was the amount so contributed (*i. e.*, the capital stock paid in) the sum in mind?

One intention which the legislature of 1844 had was to establish a general railroad law, and this intention found expression in the act of which the section under consideration forms a part. *Concord Railroad* v. *Greely*, 23 N. H. 237, 242. Sections 10 to 20 of the act "were evidently intended to be a system of uniform law applicable to all railroads." *Opinion of the Justices*, 66 N. H. 629, 650. It is therefore necessary to construe all the sections together. Each part is to aid in the interpretation of the whole. " One part of a statute must be so construed by another that the whole may (if possible) stand." The interpretation should furnish " matter for every clause of the statute to work . . . upon." 1 Bl. Com. 89 ; *Barker* v. *Warren*, 46 N. H. 124 ; *Stanyan* v. *Peterborough*, 69 N. H. 372, 373. In another section of the act is the following provision: " The rates of toll for freight of passengers and merchandise, when the net income of the stock shall exceed ten per cent, shall be subject to alteration by the legislature, according as they shall deem just and expedient." Laws 1844, c. 128, s. 13. Here there is no uncertainty as to the principal sum upon which

the percentage is to be computed. It is the capital stock — the amount contributed by the owners of the joint venture. They are allowed a net income of ten per cent upon their investment, or, from the standpoint of the stockholders, upon their expenditures. Is the meaning different in section 11 ?

This section provides for the return of unreasonable exactions as nearly as possible to those who have suffered thereby. *State* v. *Railroad*, 69 N. H. 35, 48. Section 13 provides a method by which like future exactions may be prevented. In one instance there is to be an accounting for excessive charges received; in the other there may be a legislative prohibition of the wrong in the future. It is natural to suppose that the limit of what was allowed to the railroad would be the same in either case. The evil to be guarded against or remedied was excessive tolls; and no reason appears why a rate should be considered unreasonable as to the future and not as to the past. In section 11 the language is "net receipts . . . on their expenditures," and in section 13 "net income of the stock." In view of the fact that both provisions are found in one scheme of general law, the inference is that the phrases mean the same thing. If this is not so, the act is inconsistent with itself. The object to be attained is the same under either section — the limitation of tolls to reasonable rates. " The general statute was not a change of policy, but of method." *State* v. *Railroad*, 69 N. H. 35, 48. In pursuit of this object, both remedial and preventive legislation was enacted. If there is any evidence to show that the public rights sought to be protected were greater or less in the one case than in the other, it has not been pointed out.

If the defendants' position were sound, it would follow that while the railroad could retain the sums here sought to be recovered, yet the state by reducing the tolls could have prevented the railroad from receiving the money. In this way one part of the act could be used to defeat the operation of another. Action by the state reducing the tolls might still later be nullified by the road. For example, if stock was issued to the amount of $500,000, and the road was built at a cost of $1,000,000 (of which sum the corporation owed one half), the corporation could in the first year divide to its stockholders ten per cent upon the cost of the road, or $100,000. The state could not recover any part of this; but the legislature might enact that for the next year the tolls should be reduced so that the net income would be only $50,000. For this year the legal limit of the dividend, because of legislative action fixing the tolls, would be only one half what it was the previous year. Now if, in the third year, the corporation should fix its tolls so high that it would have $150,000 net profits, and should divide

that sum to the stockholders, when sued for the excess it would answer it had only divided an average of ten per cent from the beginning upon the cost of the road, and that the law allows. A construction which leads to such results puts "an undesigned and novel inequality in the place of uniformity, in violation of elementary principles." "If a statute is capable of two meanings, and one is more reasonable and therefore more probable than the other, this fact is necessarily considered with all other competent evidence, on the question of intent." *Opinion of the Justices*, 66 N. H. 629.

If the provisions of these sections were in acts passed at different times, there would be more ground for claiming that they had different meanings. When, as in this case, they are parts of one act, the rule to so construe it that the whole will, if possible, stand is of the highest importance. It has heretofore been said that the provision of section 11 " relates to . . . an excess of net income above ten per cent," and that of section 13 " to the alteration of tolls when the net income exceeds ten per cent." *Opinion of the Justices*, 66 N. H. 629, 671. There was in that opinion no suggestion that the net income should be computed in one way in one event and in another way in the other event. While there are many reasons for fixing the same sum as the basis for computation in each case, no reason is suggested for a different rule. The sole argument advanced is based upon a technical construction of the language of the act. The competent evidence tends to prove that the legislative intent was that the net income should be computed upon the basis of the stock. " What is within the legally proved intention of the legislature is within the statute, though not within the letter ; and what is within the letter but not within the intention is not within the statute." *Opinion of the Justices*, 66 N. H. 629, 655.

The defendants' arguments against this conclusion are chiefly drawn from the construction which they say should be placed upon section 10 of the general law and section 9 of the charter. " The state may, at any time after twenty years, resume the right and privilege of the corporation in such railroad, on giving one year's notice and paying to the corporation all it may not have received of its expenditures, and interest on such expenditures, at the rate of ten per cent per annum." Laws 1844, *c.* 128, *s.* 10. It is argued that here, at least, expenditures means cost of construction. An examination of the section shows the claim to be unfounded. The object of this section was different from that of sections 11 and 13. Their aim was to prevent the corporation from taking what did not belong to it, while this was enacted to enable the state to buy the property of the corporation. The property to be purchased was not necessarily the railroad free from all debt. It was

" the right and privilege of the corporation in such railroad." For the amount stipulated the state could succeed to the right of the corporation. Like any other successor who pays a price for the interest of another in an enterprise, the state would take the concern as it was, subject to the burden of debts, or made valuable by credits due to it. Here, as in the other sections, the expenditures referred to were those of the stockholders. Upon repayment of those and any deficiency in the annual income, the state steps into the place of the corporation, so far as owning the property goes. This is the only intelligible meaning to be given to the phrase " resume the right and privilege of the corporation in such railroad." This meaning is made still clearer by an examination of the provision of the charter upon the subject. " The state, . . . after the expiration of twenty years from the time of the completion of said road, may purchase the same of said corporation, and all the franchise rights and privileges of said corporation, by paying them therefor the amount expended in making said road, and in case at the time of the purchase the said corporation shall not have received a net income equal to ten per cent per annum on the amount of such expenditure from the time of the payment thereof by the stockholders, by paying said corporation such additional sum as, together with the tolls and profits of every kind which they shall have received from said railroad, will be equal to a net profit of ten per cent per annum on the cost of said road, from the time of the payment thereof by the stockholders to the time of purchase." Laws 1847, *c.* 549, *s.* 9. Here is a further specification of what is meant by expenditures. They are what has been expended by the stockholders. The phrase " the payment thereof by the stockholders," shows in a clear light the legislative intent. The sum upon which the income was to be computed was what the stockholders had expended — not what the corporation might be owing for borrowed money.

It is further argued that if the corporation built the road without issuing any stock, the whole net profit might be recovered by the state,— a result which the defendants assume is beyond question outside the legislative intent. Conceding, for the purpose of the argument, that the corporation could legally carry on business in this way, the result would be as stated. This is the true construction of the act. The defendants assert that the legislature could not have intended such a result, but they advance no reason why a corporation which has risked nothing of its own should reap a profit. To whom would such profit go? Not to those who loaned the corporation money, for payment of interest to them must be made before there could be any net income. It would not go to stockholders, for there would be none in exis-

tence. The intangible thing called the corporation, in which no one had any financial interest, might well be called upon to return to the state the privileges in the development of which no one had risked anything as proprietor. Beyond this, it is not probable that the legislators of 1844 had in mind the modern methods of doing business referred to in the defendants' proposition. It was then supposed that the right to issue stock was granted for the purpose of enabling the company to accumulate the capital with which to carry on business. The construction of the act cannot be based upon the unfounded assumption that the legislature expected that this and other railroad corporations were to be nothing but names, and without financial substance. "The meaning of a written law is not found, beyond the fair scope of its terms, in . . . a policy not sufficiently established at the date of the act to be presumably known to the legislature." *Opinion of the Justices,* 66 N. H. 629, 665.

The legislature intended to pass a general law applicable to all railroads. It intended to have each section of the act have some effect. It intended to pass a law which was not in conflict, one part with another. Its members thought, understood, and intended in accordance with what was then known and understood. Giving due weight to these facts in the interpretation of the statute, it appears more probable than otherwise that the phrases "expenditures and interest on such expenditures" (Laws 1844, *c.* 128, *s.* 10), "their expenditures from the commencement of their operations" (*Ib., s.* 11), "the net income of the stock" (*Ib., s.* 13), and "the cost of said road from the time of payment thereof by the stockholders" (Laws 1847, *c.* 549, *s.* 9) all refer to a common quantity as the basis upon which the computations were to be made. This quantity is the capital stock paid in, and upon this sum the percentage is to be calculated.

For a considerable time the annual dividend or net income was less than ten per cent upon the capital stock. In one year it exceeded that amount. Upon the whole, it exceeded an average of ten per cent from the commencement of their operations, unless the stockholders are to be credited with interest upon the deferred dividends. Whether they are to be so credited depends upon the meaning of the statute. The referee ruled that such meaning, or the intent of the parties, was a question of fact, and he passed upon it as such. The defendants now contend that this finding is conclusive, and cannot be reviewed here. It was based upon the statement that "the interpretation of this charter, like the interpretation of any other grant, statutory, contractual, or testamentary, is the ascertainment of intention; and the question of intention is a question of fact to be determined upon competent

evidence." *Burke* v. *Railroad*, 61 N. H. 160, 233. Taken by itself, this might justify the ruling of the referee; but the remark was not intended for a statement of the whole law. The fact that in the case in which the language is used the court decided the question referred to at the law term, and as questions of law are disposed of, is sufficient to show that the application of the remark made in the present case was erroneous. The law is more fully stated in a companion case to that quoted from. " The legal construction of the act is the ascertainment of the intention of the legislature. In one sense, their intention is a matter of law: it is a question for the court. In another sense, and for the purposes of the present inquiry, it is a matter of fact: it is to be determined by the natural weight of competent evidence." *State* v. *Hayes*, 61 N. H. 264, 330. Whatever name is given to the question involved,— whether it is called a question of fact determinable by the court upon all the competent evidence, or a question of law determinable by the court, but like a question of fact, — the essential proposition concerning it remains. It is a question for the court. As the referee treated this inquiry as one upon which his finding was conclusive, he did not pass upon certain questions of fact which are material in the view here taken of the nature of the question under consideration.

There is a finding as to the amount distributed to stockholders, but whether it was taken from the net income is left undetermined. Until this fact is found for the state there can be no recovery in this suit. " The state in this action stands precisely as an individual in a like action. It is subject to the same rules of law and evidence. It has no greater power, rights, or privileges than any plaintiff. It must establish the defendants' legal indebtedness, or it must fail." *State* v. *Railroad*, 69 N. H. 35, 49. It appears that the total dividends exceed ten per cent per annum by $69,100.38. What the nature of these dividends was, whether they came from earnings, from an illegal division of the capital, or from some other source, is not distinctly found. An essential fact for the state to establish is that they came from the earnings or net receipts for the use of the road. It must show that the defendants have taken from the public and distributed to their stockholders more than the amounts fixed in the statutory grants. If the sums distributed have come from different sources, and not more than the legal amount has been collected from the public as tolls, the state cannot prevail here. This statute was enacted for the sole purpose of securing to the public reasonable rates of toll. Its purpose was not to obtain revenue, but to enforce the established policy of the state; and the suit is brought to recover excessive tolls, in order that the same may be returned as nearly as

possible to those who suffered by the exaction. *State* v. *Railroad*, 69 N. H. 35, 48. If no more has been taken from the public than the law permits, there is nothing to return. The statute under which this suit is brought relates only to the question of reasonable tolls. It was not designed to regulate the acts of railroad corporations in other matters; and whether the funds have been legally or illegally divided is of no consequence in this proceeding, unless it affirmatively appears that they came from the net receipts for the use of the road.

It appears that this objection was seasonably made at the trial. It was claimed by the defendants that a large part of the sum recovered in their suit against the Concord Railroad, and distributed as dividends, was an award for their rights in certain property and of interest upon payments of income which should have been made at a time when the principal sum would not have exceeded the legal limit of dividends. The referee did not pass upon the question so raised because, as stated in the report, it was immaterial in the view he took of the method by which the legal limit for dividends was to be determined. The question now becomes material. "It often happens that grave and difficult questions of law arise, . . . which disappear upon an investigation of the facts. In these cases, it is clear that the facts should be found before an attempt is made to settle the law controlling the rights of the parties." *Fellows* v. *Fellows*, 68 N. H. 611, 612; *Winnipiseogee etc. Co.* v. *Gilford*, 66 N. H. 621; *State* v. *Morin*, 65 N. H. 667.

The report should be recommitted for further findings of fact.

*Case discharged.*

CHASE, PIKE, and YOUNG, JJ., did not sit: the others concurred.